✓ FILED ___ ENTERED
___ LOGGED _____ RECEIVED

1:51 pm, Sep 24 2024

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ____TTD____ Deputy

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CASE NO.** 24 - 2349 - ADC |
| | * | **CASE NO.** 24 - 2350 |
| **MICHAEL MICKLOS, JR.** | * | **CASE NO.** 24 - 2351 |
| a/k/a "Buckets," | * | **CASE NO.** 24 - 2352 |
| **CAN XU,** | * | **CASE NO.** 24 - 2353 |
| a/k/a "Shawn," | * | **CASE NO.** 24 - 2354 |
| **PRAVEEN MORGAN,** | * | **CASE NO.** 24 - 2355 |
| a/k/a "Veen," | * | **CASE NO.** 24 - 2356 |
| ▇▇▇▇▇▇▇▇, | * | **CASE NO.** 24 - 2357 |
| **HUAYI ZHONG,** | * | **CASE NO.** 24 - 2358 |
| **ZEBIN LIU,** | * | |
| **CHUNBING QIN,** | * | **FILED UNDER SEAL** |
| **QIHAI TAO,** | * | |
| **PENG HUANG, and** | * | |
| **ISAAC HUYNH,** | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TABLE OF CONTENTS

I.     **INTRODUCTION** ...............................................................................3

II.    **AFFIANT'S EXPERTISE** ................................................................6

III.   **PROBABLE CAUSE** ......................................................................10

    A.    **BACKGROUND** ....................................................................10

    B.    **AUTHORIZATION FOR TITLE 3 INTERCEPTS**…..………………13

    C.    **TARGET SUBJECTS, SUBJECT PREMISES, TARGET VEHICLE, and ARREST SUBJECTS Overview**.................................15

    D.    ███████████████████████████████
        ████████████████…………………..……21

    E.    ███████████████████████████████
        █████…………………………………………………...30

    F.    ███████████████████████████████
        ██████████████…………………………35

    G.    ███████████████████████████████
        ███████…………………………………………44

    H.    ███████████████…………………………...55

    I.     **PRAVEEN MORGAN**…………………………………………62

    J.    **CAN XU, HUAYI ZHONG, ZEBIN LIU, CHUNBING QIN, QIHAI TAO, PENG HUANG, and ISAAC HUYNH**…………………………66

IV.   **BIOMETRIC UNLOCKING**…………………………………………80

V.    **CONCLUSION**……………………………………………………..82

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS AND IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

Your affiant, Ryan Welsh, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, deposes and states as follows:

## I.    PURPOSE OF THIS AFFIDAVIT

1.      Pursuant to Federal Rule of Criminal Procedure 41, I make this affidavit in support of applications for a criminal complaint, arrest warrants, and search warrants.

2.      As discussed further below, an investigation into two separate non-fatal shootings of one individual in Baltimore, Maryland has revealed a sprawling network of individuals laundering millions of dollars generated from the illegal distribution of massive quantities of marijuana.    That network includes large-scale launderers and drug traffickers operating in Maryland and sending large quantities of bulk cash proceeds from Maryland to other states, including New York, New Jersey, and Washington to obtain further shipments of marijuana and to conceal the source of the proceeds.    Further up within the network, individuals (based primarily in New York) collect millions of dollars in proceeds from Maryland and other states that they then transport (via various means) to other launderers and drug traffickers in Washington state and elsewhere to obtain larger shipments of marijuana and ensure that the source of the cash is concealed.

3.      Specifically, I make this affidavit in support of applications for search warrants for the following locations (collectively, the "**SUBJECT PREMISES**"):

a.    █████████████████████████████████████

███████████████████████████████

█  ████████████████████████████████

████████████████████████████

c. 

4.    I further submit this affidavit in support of search warrants for the following people (collectively, the "**TARGET SUBJECTS**"):

a.

b. ███████████████████████████

███████████████████████████

█ ███████████████████████████

███████████████████████

█ ███████████████████████████

████████████████████

█ ███████████████████████████

██████████████████████

█ ██████████████████ ██████████

█████████████████

█ ███████████████████████████

████████████████;



5.    I further submit this affidavit in support of a search warrant for the following vehicle (the "**TARGET VEHICLE**");

a. ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████;

6.    Finally, I submit this Affidavit in support of a criminal complaint and arrest warrants for the following individuals: ██████; Michael Micklos, Jr. ("MICKLOS"); Can Xu ("XU"); Praveen Morgan ("MORGAN"); Huayi Zhong ("ZHONG"); Zebin Liu ("LIU"); Chunbing Qin ("QIN"); Qihai Tao ("TAO"); Peng Huang ("HUANG"); and, Isaac Huynh ("HUYNH") (the "**ARREST SUBJECTS**").

7.     Based upon my training and experience, I submit that there is probable cause to believe that the **TARGET SUBJECTS** use the **SUBJECT PREMISES** in furtherance of criminal activity, including, violations of 18 U.S.C. 1956(h) (Conspiracy to Commit Money Laundering) and 21 U.S.C. 846 (Conspiracy to Distribute Controlled Substances) (collectively, the **SUBJECT OFFENSES**).    I further submit that there is probable cause to believe that the **TARGET SUBJECTS** and the **SUBJECT PREMISES** contain fruits, evidence, and instrumentalities, as more fully described in Attachment B, of said **SUBJECT OFFENSES**.

8.     Based on the facts in this Affidavit, I respectfully submit that there is probable cause to believe that the **ARREST SUBJECTS** have committed the following offenses: 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering) and 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances).

## II.      AFFIANT'S BACKGROUND AND EXPERTISE

9.     I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of United States Code Title 18.

10.     I have been a DEA Special Agent ("SA") since December 2020. I am currently assigned to the Baltimore District Office, Strike Force 1 group, which investigates drug trafficking organizations and their ties to violence.  I received 14 weeks of training in narcotics investigations and related legal matters at the DEA Training Academy in Quantico, Virginia.

11.     Prior to my employment as an SA with the DEA, I was employed as a police officer/detective by the Baltimore Police Department from January 14, 2014, until September 4, 2020. During my law enforcement career with the Baltimore Police Department, I spent

approximately two years in the Northwest District drug unit conducting street-level drug investigations, followed by three years as a Task Force Officer ("TFO") with Strike Force 1 of the DEA.  During my time as a TFO in Strike Force 1, I conducted high-level narcotics investigations to include wiretap investigations of violent street-level drug trafficking organizations ("DTOs") and kilogram quantity drug traffickers.  As a result, I have been involved in the arrests of drug traffickers.

12.     During my time as a law enforcement officer, I have participated in multiple investigations involving money laundering and drug trafficking to include the use of Title III ("T-III") wiretaps, confidential informants, undercover transactions, physical and electronic surveillance, telephone toll analysis, the execution of search and seizure warrants, and the recovery of substantial quantities of narcotics.

13.     Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the possession and use of firearms in connection with trafficking of such drugs, and the methods by which narcotics traffickers collect, store, conceal, and launder the proceeds of their illegal activities. I have also become familiar with how drug traffickers use telephones, cellular telephone technology, pagers, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

14.     Through training, interviewing of dozens of persons arrested for controlled substance offenses, watching hundreds of hours of surveillance of suspected drug traffickers, and monitoring of countless hours of intercepted communications involving drug trafficking, I am familiar with the actions, traits, habits, and terminology utilized by drug traffickers.

15.     Based upon that training and experience, I have learned the following:

a.   Drug traffickers keep and maintain records of their various activities.  Such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms.  Documents commonly concealed by drug traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators.  These items are kept in locations that are considered safe by the drug traffickers such as safety deposit boxes, residences, vehicles and on their person, where they have ready access to them. Drug traffickers often have several residences decreasing the likelihood of detection by law enforcement;

b.   Drug traffickers may use computers or other electronic storage media, including smart phones, to store the records of documents listed in paragraph a;

c.    Drug traffickers maintain on hand large amounts of cash to maintain and finance their narcotics business, which is typically concealed in their residences or vehicles along with financial instruments and evidence of financial transactions relating to narcotics trafficking activities;

d.   Drug traffickers engage in activities designed to conceal the nature, source, location, ownership, or control of drug proceeds;

e.   Drug traffickers use cellular telephones, pagers and other electronic communications devices to facilitate illegal drug transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals, including photographs and other identifying information stored on these devices;

f.   Drug traffickers commonly possess firearms and other weapons to protect and secure their narcotics and money from loss to law enforcement agents or other members of the criminal element that are motivated by greed; and

g.   Drug traffickers commonly possess packaging material, cutting agents, digital scales, and other items used in the preparation and packaging of controlled substances.

h.   Drug traffickers commonly use vehicles to conceal and transport ledgers, packaging materials, cutting agents, digital scales, illegal drugs, proceeds from illegal drug sales, and other items associated with illegal drug trafficking. These vehicles are often purchased with illegal drug proceeds and are often registered in the names of other persons to conceal the identity of the drug trafficker who uses the vehicle.

16.    Because this affidavit is being submitted for the purpose of establishing probable

cause to issue a complaint and arrest warrant for the **ARREST SUBJECTS**, and to search the

**TARGET SUBJECTS,** the **SUBJECT PREMISES,** and the **TARGET VEHICLE**, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and intercepted conversations, as well as conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated. Summaries and descriptions, including quotations, of recorded conversations are based upon my review of the audio recordings. Because this investigation relied upon the interception of wire and electronic communication over cellular telephones, I have included my interpretation of those communications throughout this affidavit, and in some instances have placed in parentheses my "translation" of the words or terminology used, or placed in brackets additional words necessary to clarify and/or complete the conversation. These interpretations, as well as my opinions contained herein, are based upon my training and experience, as well as my knowledge gained during this investigation of the operation of this particular money laundering and drug trafficking organization.

17. The below communications are being intercepted in several languages to include English, Taishan, Cantonese and Mandarin. Investigators are utilizing certified and vetted DEA third-party translators who are embedded within the wire room and listen to intercepted calls in real time, then transcribe those calls on a rolling basis. References to any calls made in a foreign dialect in this affidavit have been translated by this team of translators, who are qualified and trained to translate Taishan, Cantonese and Mandarin, and other regional dialects, into English.

### III.    PROBABLE CAUSE

#### A.    BACKGROUND

18.    In February 2023, Detectives with the Baltimore Police Department (BPD) contacted the DEA and advised they were investigating the non-fatal shooting of an individual identified as Michael MICKLOS Jr.  Detectives explained that MICKLOS had recently been involved in what they believed was a drug deal gone bad where MICKLOS was shot at but not injured. During that investigation, detectives recovered over five pounds of marijuana and over $100,000 in bulk U.S. currency from MICKLOS' rental vehicle.

19.    Approximately a week later, in a separate incident, BPD arrived at the 3800 block of Wabash Avenue in Baltimore, Maryland in response to a report of a shooting.  MICKLOS, who was located at the scene, had been shot multiple times to his pelvic region.  Due to the severity of his injuries, he was transported to Maryland Shock Trauma for immediate medical attention. Investigating officers discovered several shell casings on a roadway and a nearby apartment complex parking lot.  Investigating officers also located a vehicle with significant amounts of blood in the driver and passenger areas, as well as other vehicles and property damaged by fired bullets.  A canvass of the area resulted in investigators recovering multiple pounds of marijuana that MICKLOS attempted to discard prior to police arrival.  MICKLOS refused to cooperate or provide additional information to detectives during their investigation.

20.    In December 2023, in follow up to this initial investigation, I utilized an undercover Instagram account to monitor Instagram accounts of suspected drug dealers and money launderers, including MICKLOS.    I identified an Instagram account—labelled "1Buckets"—that was viewable to the public. This account contained several photographs of MICKLOS, which led me to believe that the "1Buckets" account was used by MICKLOS.  I have also corroborated through

MICKLOS' social media posts, as well as intercepts on the wiretap, that "Buckets" is a moniker utilized by MICKLOS.

21.     As to the Instagram account, I viewed photographs of MICKLOS posing with large amounts of cash. In some of those same photographs, thousands of dollars in bulk U.S. currency and pound quantities of marijuana can be seen (as further depicted below):



22.     I also viewed videos posted by MICKLOS that showed large amounts of suspected drug proceeds, with his personal diamond necklace laid across the money (as depicted below):



23.     Furthermore, the Instagram account promoted a "Telegram"[1] page where MICKLOS marketed pound quantities of marijuana for sale. MICKLOS listed different strains of marijuana he had available as well as prices from as low as $600 to upwards of $1,500, per pound. MICKLOS claimed to have the lowest prices on the East Coast and the ability to ship marijuana worldwide. The "Telegram" account listed two telephone numbers, including 410-459-7983, to place a marijuana order (as depicted below):



24.     Based on the above-described events, coupled with the photos and videos on MICKLOS' Instagram account, I believe MICKLOS is a leader of a well-structured nationwide

---

[1] Telegram Messenger, commonly known as Telegram, is a cloud-based, cross-platform, social media and instant messaging service.

marijuana trafficking organization that generated significant amounts of drug proceeds (the "MICKLOS DTO") and that MICKLOS and others were involved in money laundering and concealing the nature, source, location, ownership, or control of those proceeds.

25.    Since the inception of the investigation, agents have utilized numerous techniques, including undercover purchases, surveillances, search warrants, GPS tracking and other investigative techniques, to further investigate the drug proceeds of the MICKLOS DTO.

26.    These investigative steps ultimately led to T-III authorization to intercept MICKLOS's communications, as further detailed *infra*.

### B. AUTHORIZATION TO INTERCEPT TELEPHONIC COMMUNICATIONS

27.    On March 1, 2024, the Honorable Julie R. Rubin, United States District Judge for the District of Maryland, authorized the interception of electronic communications occurring over ████-7983 (**TARGET TELEPHONE 1**), utilized by an individual identified as MORGAN; and further authorized the interception of wire and electronic interceptions occurring over ██ ██-1710 (**TARGET TELEPHONE 2**), utilized by Michal Tilmon III ("TILMON"), and phone number ████-6556, utilized by JONES (**TARGET TELEPHONE 3**).

28.    On April 5, 2024, Judge Rubin authorized the continued interception of electronic communications over ████-7983 (**TARGET TELEPHONE 1**) and wire and electronic interceptions over ████-1710 (**TARGET TELEPHONE 2**) and wire interceptions over ██ ██-6556 (**TARGET TELEPHONE 3**). Judge Rubin also authorized the initial interception of wire communications over ██████ (**TARGET TELEPHONE 4**), utilized by ██████, phone number ██████ (**TARGET TELEPHONE 5**), also utilized by ██████, phone number ████-0093 (**TARGET TELEPHONE 6**), utilized by XU and phone number ██████ 4571 (**TARGET TELEPHONE 7**), utilized by ZHONG.

29.      On May 3, 2024, Judge Rubin authorized the continued interception of wire and electronic communications over ███-1710 (**TARGET TELEPHONE 2**), ███-4237 (**TARGET TELEPHONE 4**), ███-█ (**TARGET TELEPHONE 5**), ███-0093 (**TARGET TELEPHONE 6**) and ███-4571 (**TARGET TELEPHONE 7**). Judge Rubin also authorized the initial interception of wire communications over ███-3256 (**TARGET TELEPHONE 8**), utilized by MICKLOS, ███-4976 (**TARGET TELEPHONE 9**), utilized by MICKLOS, phone number ███-2921 (**TARGET TELEPHONE 10**), thought to be utilized by Eddie Lin ("LIN"), phone number ███-6318 (**TARGET TELEPHONE 11**), utilized by TAO, and wire and electronic communications over ███-4214 (**TARGET TELEPHONE 12**), utilized by MICKLOS.

30.      On May 31, 2024, Judge Rubin authorized the continued interception of wire and electronic communications over ███-0093 (**TARGET TELEPHONE 6**) and ███-4571 (**TARGET TELEPHONE 7**), wire communications over ███-4976 (**TARGET TELEPHONE 9**), wire communications over ███-6318 (**TARGET TELEPHONE 11**) and the wire and electronic communications over ███-4214 (**TARGET TELEPHONE 12**). Judge Rubin also authorized the initial interception of wire communications over ███-0636 (**TARGET TELEPHONE 13**), utilized by Anya Dai ("DAI").

31.      On June 27, 2024, Judge Rubin authorized the continued interception of wire and electronic communications over ███-0093 (**TARGET TELEPHONE 6**) and ███-4571 (**TARGET TELEPHONE 7**) and the interception of wire communications over ███-4976 (**TARGET TELEPHONE 9**), wire communications over ███-6318 (**TARGET TELEPHONE 11**) and the wire and electronic communications over ███-4214 (**TARGET TELEPHONE 12**) and ███-0636 (**TARGET TELEPHONE 13**).

32.     On July 24, 2024, Judge Rubin authorized the continued interception of wire and electronic communications over ██████-0093 (**TARGET TELEPHONE 6**) and ██████-4571 (**TARGET TELEPHONE 7**) and the interception of wire communications over ██████-4976 (**TARGET TELEPHONE 9),** wire communications over ██████-6318 (**TARGET TELEPHONE 11**), wire and electronic communications over ██████-4214 (**TARGET TELEPHONE 12**) and the initial interception of wire and electronic communications ██████-8088 (**TARGET TELEPHONE 14**), utilized by Qing Meng ("MENG").

33.     Over the course of these interceptions, investigators identified DTO members operating under MICKLOS's direction in various cities throughout the United States. Investigators were further able to identify sources of supply responsible for supplying the MICKLOS DTO with thousands of pounds of marijuana.  To date throughout this investigation, investigators have conducted enforcement operations leading to the seizure of approximately 300 pounds of marijuana, firearms, over $3 million in bulk U.S. currency, and other evidence of drug trafficking and money laundering.

## C. OVERVIEW OF TARGET SUBJECTS, SUBJECT PREMISES, TARGET VEHICLE, and ARREST SUBJECTS[2]

34.     **MICHAEL MICKLOS, Jr.**: MICKLOS is the leader and mastermind behind a multimillion-dollar marijuana distribution network operating in: Baltimore, Maryland; Richmond, Virginia; the greater New York area; and, Allentown, Pennsylvania.  MICKLOS is also the user of **TARGET TELEPHONE 9** and **TARGET TELEPHONE 12**.  MICKLOS also sources marijuana for illegal distribution, and launders his drug proceeds, with the assistance of XU.

---

[2] This overview section is included to provide a general summary of the relevance of each TARGET SUBJECT, SUBJECT PREMISES, ARREST SUBJECT, and the TARGET VEHICLE.  The assertions made herein are further articulated in the following sections of the probable cause section of the affidavit.

35.     **CAN QUAN XU**: XU, a/k/a "Shawn," has been identified as a multi-million-dollar marijuana distributor operating a DTO in New York, as well as the leader of a well-structured money laundering organization ("MLO") in which he employs several confederates to conceal the nature, source, location, ownership, or control of the drug proceeds. XU and his associates work with marijuana sources of supply to obtain bulk quantities of marijuana and then repackage, rebrand, and distribute the marijuana to customers for distribution on the east coast. XU then collects millions of dollars in drug trafficking proceeds from his customers, which he then turns back over to his suppliers and/or sends to bank accounts located in the People's Republic of China (PRC) using wire transfers. XU also uses the money earned through his drug trafficking for both personal use and to promote the activities of the DTO, including paying rent at locations used as stash houses, paying members of his DTO, purchasing properties, and purchasing vehicles. XU is the user of **TARGET TELEPHONE 6**.

36.     **PRAVEEN MORGAN**: MORGAN is a member of the MICKLOS DTO who is responsible for receiving marijuana orders from customers for each DTO in every city to include Baltimore, Maryland, which occur over **TARGET TELEPHONE 1**. MORGAN is also responsible for keeping inventory of the marijuana the DTO has sold in each city and the amount of drug proceeds that have been collected. MORGAN does not have a criminal history.

37.     ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████



38.     **Huayi ZHONG**: ZHONG, a/k/a "Daniel," is a member of the XU MLO/DTO responsible for receiving marijuana shipments, packaging marijuana, distributing marijuana to customers, and picking up/transporting drug trafficking proceeds in the form of bulk U.S. currency. ZHONG often refers to XU as his "Boss" during intercepted communications and is paid based on the amount of marijuana he transports for XU. ZHONG is the user of **TARGET TELEPHONE 7**.

39.     **Zebin LIU**: LIU, a/k/a "Ben," is a member of the XU MLO/DTO, with the same responsibilities as ZHONG, including receiving marijuana shipments, packaging marijuana, distributing marijuana to customers, and picking up/transporting drug trafficking proceeds in the form of bulk U.S. currency. LIU often refers to XU as his "Boss" and is paid based on the amount of marijuana he transports for XU. LIU is the user of the phone assigned call number (718) 980-8239.

40.     **Chunbing QIN**: QIN, a/k/a "President Qin," has been identified as a Portland, Oregon, based marijuana supplier for the XU MLO/DTO, as well as a close associate of XU's.

QIN often orchestrates shipments of marijuana to New York and helps direct the transfer of drug trafficking proceeds in the form of bulk U.S. currency from the XU MLO/DTO back to QIN and his associates. QIN is also a known associate of HUYNH, who, as noted above, has been delivering drug trafficking proceeds via FedEx. QIN is the user of the phone assigned call number 503-899-2425.

41. **Qihai TAO**: TAO has been identified as a Seattle-based marijuana supplier for the XU MLO/DTO and other DTOs across the United States. TAO and his associate, HUANG, work together to obtain bulk quantities of marijuana from different sources and then ship the marijuana in large pallets or crates to destination cities, including Baltimore. TAO also orchestrates the transportation of drug trafficking proceeds to Seattle, often by using "mules" transporting the proceeds in their checked airline luggage. TAO is the user of **TARGET TELEPHONE 11**.

42. **Peng HUANG**: HUANG, a/k/a "Rio," is a member of the TAO DTO, based out of Seattle, Washington. HUANG is responsible for helping TAO obtain bulk quantities of marijuana, which are then shipped to cities across the United States. HUANG usually flies to the destination cities and oversees the transfer of the marijuana to the TAO DTO's customer(s) in that area. HUANG also obtains drug trafficking proceeds from the DTO's customers and transports the proceeds back to Seattle in his checked airline luggage.

43. **Isaac HUYNH**: HUYNH, a/k/a "Brother Hua," has been identified as a member of the XU MLO/DTO. HUYNH is responsible for obtaining bulk amounts of drug trafficking proceeds and shipping them, via FedEx, to XU's suppliers. Investigators have seized numerous packages shipped by HUYNH during the course of this investigation, and those packages collectively contained over $650,000 in U.S. currency. HUYNH is the user of the phone assigned call number 415-889-9921.

44. 

45.

███████████████████████████████████████████████████

███████████████████████████████████████ .

46.   ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ .

47.   ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████ .

48.   ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

49. ████████████████████████████████

**D.** ████████████████████████████████

50. ████████████████████████████████

51. ████████████████████████████████

21



52.

53.

54. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████.

55. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████



56. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████.

57. ████████████████████████████████████████████

████████████████████████████████████████████████.



?"

."

58.

59.

60. ███████████████████████████████████████████████████

61. ███████████████████████████████████████████████████

62. ███████████████████████████████████████████████████

63. ███████████████████████████████████████████████████

64. ███████████████████████████████████████████████████

65. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████



66. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████.

67. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████.

68. 

69.

70.

71.

72. ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████.

73. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████.

74. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████.

75. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████.

76. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████



77. ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████

78. ███████████████████████████████████
███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████.

**E.** ████████████████████████████████████

79.    ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████.

80.    ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████.

81.    ████████████████████████████████████

████████████████████████████████████████    ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████.

82.    ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████.

83.    ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████.

84.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████





85. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

86. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

87. 

88.

89.



90.  ████████████████████████████████████████████

███████████████████████   ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████."

91. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

92. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████.

93. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

**F.** ███████████████████████████████████████████████.

███████████████████████████████████████

94. ███████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████.

95.    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

96.    ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████    ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



97.

98.

99.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

100.   ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████

101.   For example, in June 2024, investigators learned that MICKLOS's supplier, XU, was orchestrating a large shipment of marijuana to be delivered to Baltimore from Seattle. Investigators learned the shipment had arrived on June 24, 2024. Investigators surveilled ██████ and observed him picking up a U-Haul truck from HUANG.[5] MACK drove the truck to ████ ████████████████ and proceeded to unload multiple cardboard boxes, believed to contain hundreds of pounds of marijuana, with the help of an unknown associate as depicted in the red circles below. ████████ then returned the U-Haul truck to HUANG.



---

[5] HUANG is a member of the TAO DTO operating out of Seattle. HUANG flew to Baltimore from Seattle to oversee the delivery of the marijuana shipment to MICKLOS' DTO members.

102.    On July 18, 2024, investigators learned another large shipment of suspected marijuana arrived from Seattle for the MICKLOS DTO.  Again, ▮▮▮▮ picked up a U-Haul truck from unidentified Asian associates of HUANG and TAO and drove it to ▮▮▮▮▮▮▮ ▮▮▮▮.  ~~MACK~~ unloaded the boxes, believed to contain hundreds of pounds of marijuana, into ▮▮▮▮▮▮▮ and then returned the U-Haul to the Asian males.



103.    On this same date, at approximately 12:44 p.m., ▮▮▮▮▮▮▮, a known DTO member, loaded multiple boxes from ▮▮▮▮▮▮▮ into **THE TARGET VEHICLE** and then left together.  GPS location data from **THE TARGET VEHICLE** showed ▮▮▮, along with ▮▮▮, drove to ▮▮▮▮▮▮▮, where investigators believe they unloaded the boxes of suspected marijuana.



104. ███████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████

105. ███████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████



106. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████.

107. █████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████   ████████████████████████████████   ████████
████████████████████████████████████████.

108. ███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

109. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.

110. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████.

111. ███████████████████████████████████████████

████████████, ███████████████████████████████████████

███████████████████████████████████████████.

112. ███████████████████████████████████████████

██████████████████████████████████.

113. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[6] Agents installed this camera on or about July 29, 2024.

[7] Agents installed this camera on or about June 25, 2024.



■    Investigators know from surveillance, the "TRANSWORLD" boxes are boxes previously shipped to Maryland from Seattle by TAO and HUANG. ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████.

115.    ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

116. ████████████████████████████████████████████████

████████████████████████████████████████████████████.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

G. ████████████████████████████████████████████████,

████████████

117. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

118. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████.

119. ████████████████████████████████████████████

████████████████████████████████████████████████████,

120. ███████████████████████████████████

█████████████████████████████

121. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████.

122. ██████████████████████████████

███████████████████████████████████

███████████████████████.



███████████████████████████████████████████████.

123.    ████████████████████████████████████████

████████████████████████████████████████████████

███████████.



██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

124.    ████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████.



The DTO member placed the bag into the Chevy's rear seat.

125. ██████████████████████████████████████████
███████████████████████████████████████.

126. ██████████████████████████████████████████



127. ██████████████████████████████████████████

47



128.

129.

130.

131.



132.

133. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████



134. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████.

135. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

136. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████



137. ██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████.

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

138.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████



139.  ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



140.

141.

142.

143.

144.

145.

146. 

147.

150. ██████████████████████

151. ██████████████████████

H. ████████████████

██ ████████████████ ███████████

██ ███████████████████



157. ██████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████



158. ██████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████
██  █████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████
██  █████████████████████████████████████████████████
█████████████████████████████████████████████████████





163.

██████████████████████████████████████████████

████████████████.



168.   ███████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██   ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████

170.   ███████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



172. 

173.

174.

175.

## I. **PRAVEEN MORGAN**

176.    During the course of this investigation, MORGAN has been identified as a DTO member in possession of the DTO shop phones and responsible for organizing marijuana orders and supplies.

177.    MORGAN, who sometimes employs the moniker "Veen," has been intercepted communicating with MICKLOS throughout this investigation discussing marijuana sales, seizure of drug proceeds, collection of drug proceeds and inventory of the DTO's marijuana supplies. MORGAN has also been observed in Maryland picking up bulk U.S. currency drug proceeds from

TILMON and transporting them back to New York in a manner to conceal the nature, source, location, ownership, or control of those proceeds.

178.    For example, on March 28, 2024, at approximately 2:44 p.m., TILMON, using **TARGET TELEPHONE 2**, called 443-969-1198, believed to be used by Dacia Carter ("CARTER"). Below is the pertinent portion of the call that started at 2:46 p.m. TILMON asked, "Did you get a chance to count them twenties? He gonna be there at seven. Imma leave here at five." CARTER stated, "Yeah I already did all that." TILMON responded, "You counted all the twenties?" CARTER advised, "Yeah I counted the twenties, the tens and the fives. Just the fifties and hundreds are still left." TILMON asked, "You already undid the other bag?" CARTER answered, "Yeah. That's done." TILMON replied, "Alright. I appreciate that." CARTER answered, "You're welcome babe. You heard me though, I said. You heard when I said it was only the um hundreds and fifties left right?" TILMON responded, "Yeah. You said you didn't do the hundreds and fifties." CARTER stated, "Yeah." TILMON stated, "That's fine." CARTER responded, "Cause I gotta, I gotta leave out right. I gotta leave out in a little bit and handle some business so I'm in the shower." TILMON responded, "I mean that's fine. I didn't mean to hold you up." CARTER said, "Oh no you didn't hold me up babe. I just you know, you know (U/I)." TILMON responded, "Yeah I didn't mean to hold you up. My fault." CARTER advised, "I have to go meet somebody real fast." TILMON asked, "Huh." CARTER responded, "I said I got to meet somebody real fast but you, you ain't holding me up so." TILMON responded, "Oh alright alright." CARTER stated, "I just gotta leave out real fast. If I get back in time before you I'll still do it but it depends." TILMON responded, "No you, I, I don't know. I'll probably be back (U/I) like five six cause I got to meet him at seven out there." CARTER responded, "Okay. Well yeah baby that sounds (U/I). The twenties is up against

the wall, its tens and stuff, the hundreds and fifties and stuff still on the, in the middle of the just

sittin there." TILMON asked, "Did you already group them in tens or no?" CARTER responded,

"Huh?" TILMON asked, "Did you group them in tens or nah? I can do that if you didn't. Don't

worry about that." CARTER asked, "You sure?" TILMON stated, "I just needed them

counted." CARTER stated, "I can do it before I leave out the door." TILMON responded, "Nah

nah nah nah nah nah. I just needed um counted. That's all." CARTER acknowledged, "Okay.

Okay." TILMON responded, "Nah, That's it. I can do the the group'em and

shit." CARTER stated, "Okay. Well it's done already." TILMON acknowledged, "I appreciate

it." The pertinent part of the call ends and switches to general conversation at 2:49 p.m.

179.    On March 28, 2024, at approximately 4:03 p.m., TILMON, using **TARGET

TELEPHONE 2**, received a call from 443-589-4897, used by Jamir Richburg ("RICHBURG").

During the call, TILMON stated, "Veen like nah bro just close early at five o'clock and meet me

out Aberdeen so I can get the money so I got to leave here early in an hour anyway so it's like."

RICHBURG stated, "Wait. Veen took the money up?" TILMON responded, "Yeah cause he

don't. Frankie don't want wanna use uh uh uh Co like that no more." RICHBURG stated,

"Because what happened with (U/I)." TILMON responded, "No he just don't want to use him like

that no more cause he saying that Co do business with other people that Frankie don't fuck wit. I

guess." RICHBURG stated, "But Co consistent as fuck." TILMON replied, "Yeah so he asked

me could Bill uh do what he was doin and drive up to New York and shit like that." RICHBURG

stated, "Fuck ass no." TILMON replied, "I'm like that's not the best idea. Feel me." RICHBURG

stated, "That no (U/I) is not capable of shit like that. Love him to death but no." TILMON

continued, "Yeah, I just was tellin him like that's not the best idea like." RICHBURG responded,

"Jesus fuckin Christ." TILMON continued, "No that's not the best idea and then I brought it up

to B cause B keep, he keep talkin to me about how he that him." RICHBURG interrupted, "Wanna get paid more." TILMON acknowledged, "Yeah. Him and Smoke need more money. They should be (U/I)." RICHBURG stated, "So he want to get paid more. (U/I) what he need to be doing coming to work on time. Coming to work at all."

180.    On March 28, 2024, at approximately 5:09 p.m., TILMON, using **TARGET TELEPHONE 2**, received a call from 443-589-4897, sued by RICHBURG. During the call, TILMON stated, "I gotta leave here meet Veen by seven o'clock." RICHBURG asked, "You got the money with you or you got to go back to get it?" TILMON replied, "Nah it's at the crib." RICHBURG stated, "Oh my goodness." TILMON responded, "I counted it I just didn't like separate it." RICHBURG interrupted, "Bring it." TILMON responded, "No I didn't separate it. I still gotta put the tens with the tens type of shit but." RICHBURG answered, "Oh you just timed it all out when you were getting it." TILMON responded, "Um hm." RICHBURG asked, "Okay. Wait so if Co's not bringing the stuff who is?" TILMON replied, "I don't know." RICHBURG acknowledged, "Okay."

181.    Based on investigators' knowledge and experience, investigators believed TILMON was preparing bulk drug proceeds in Baltimore with anticipation that MORGAN (a/k/a "Veen") would be picking them up to transport them to New York.

182.    At approximately 6:15 p.m. investigators established physical surveillance of TILMON's apartment located at 1005 Warwick Dr. Aberdeen, Maryland.

183.    At approximately 6:33 p.m. investigators observed TILMON park his blue Jeep Wrangler in front of the location and remove an empty grey Rubbermaid tote from the passenger-side rear seat. TILMON also removed a black and red "DTLR" bag. TILMON took both items inside his apartment at that time.

184.    At approximately 7:19 p.m., TILMON exited the apartment building carrying the same grey tote, however this time the tote appeared to be significantly heavier. TILMON had to place the tote on the ground before opening the passenger-side rear door and placing the tote inside.

185.    TILMON then left the area and traveled to the parking lot of the Planet Fitness, located at 1010 Beards Hill Rd., Aberdeen, Maryland. Investigators positioned themselves in the parking lot and observed TILMON remove the above-described tote and place it inside MORGAN's BMW-make vehicle, which was already parked in the lot as depicted in the red circle below.



This exchange lasted approximately 10 seconds, and both parties left the parking lot quickly and in separate directions. Further surveillance of the BMW confirmed the tag as temporary New Jersey registration C020707, registered to an individual identified as "Praveen Morgan" (MORGAN).

### J.  CAN XU, HUAYI ZHONG, ZEBIN LIU, CHUNBING QIN, QIHAI TAO, PENG HUANG, and ISAAC HUYNH

186.    During this investigation, XU was identified as a multi-million-dollar marijuana distributor operating an DTO in New York, as well as being the leader of a well-structured MLO in which he employs several confederates to conceal the nature, source, location, ownership, or

control of the drug proceeds.  These confederates included: ZHONG; LIU; QIN; TAO; HUANG; and HUYNH.

187.    For example, on April 14, 2024, at approximately 6:56 p.m., XU used **TARGET TELEPHONE 6** to call **TARGET TELEPHONE 11**, used by TAO.  During the call, XU asked, "If you receive the paper, how do you bring it back?"  TAO replied, "Where do you want me to deliver?"  XU answered, "Seattle."  TAO replied, "Paper… Paper... bring to Seattle.  Ugh, this time may not work, can we do next time?  Next time should no have problem."  XU interrupted, "Hum."  TAO continued, "For the next time, I will ask my little brother to run, then when he come back, he will directly bring to Seattle.  For the paper, I cannot insure it, then I may give some transportation fee to my little brother, check on his spending.  What do you think?"  XU asked about a "transportation fee," and TAO discussed providing a fee to an individual he referred to as his "little brother."  Due to bad signal, the call was terminated before TAO specified a fee.

188.    On April 14, 2024, at approximately 6:58 p.m., XU using **TARGET TELEPHONE 6** again called **TARGET TELEPHONE 11**, used by TAO.  During this conversation, XU asked, "If they could receive transportation this time?"  TAO replied, "Receiving transportation has no problem.  If needs to bring paper, it has to be next time, because this time, I already helped someone else to bring, after helping other people, I got a proof of fund, if it added up from you, it is definitely not enough."  XU replied, "Oh, okay, sure, next time… next time also need proof of fund."  TAO asked, "Two-hundred thousand?"  XU replied, "Yes."  TAO asked, "Or something else?"  XU replied, "It should be almost two-hundred thousand."  TAO said, "Okay, okay, no problem, no problem.  Over here, I already told my boss, I will use the money from selling car to do proof of fund.  It will be safer when flighting."  XU replied, "Okay, yes, no problem."  TAO said, "If you want me to bring, you need to tell me in advance, because now I have Atlanta

and Tampa, I will bring for them in different time. I am running this alone, I can one bring one at once. I can make arrangements, if I know in advance." XU replied, "Okay, I understand." The conversation then concluded.

189.    Based on my knowledge and experience, I believe the above calls reflect TAO's involvement in the transportation and laundering of drug trafficking proceeds. I understand that when XU and TAO referred to "paper" in the above-described calls, they were referring to drug trafficking proceeds. I understand XU to have been asking TAO to arrange the transportation of a large quantity of drug trafficking proceeds—approximately $200,000—to Seattle. I believe TAO told XU that another customer's money was being transported at this time, and that XU's proceeds would have to be moved later. I further understand that the "transportation fee" referred to a fee charged by TAO for his transportation/laundering services.

190.    On May 13, 2024, at approximately 4:23 p.m., TAO using **TARGET TELEPHONE 11** called ████-4089, used by HUANG. During the call, TAO directed HUANG to pick up "money" located at a storage unit. TAO stated he would send HUANG the unit's "code" and the "amount." TAO directed HUANG to "bring a suitcase" and call an Uber. TAO told HUANG he sent HUANG the address already and that it was "fifty minutes away."

191.    Based on other intercepted calls, investigators believe HUANG was picking up drug trafficking proceeds in Atlanta on behalf of TAO. Specifically, investigators believe the drug trafficking proceeds were from the Atlanta-based wing of the MICKLOS DTO, and HUANG was set to meet the leader of this DTO to obtain the proceeds.

192.    On May 13, 2024, at approximately 11:01 p.m., TAO using **TARGET TELEPHONE 11** called **TARGET TELEPHONE 6,** used by XU. During the call, XU complained, "That pussy only have fifty thousand dollars, wow, fuck."

193.    Based on the above-described calls, investigators believe HUANG had obtained the money from the storage unit on behalf of XU. Investigators believe XU complained to TAO that the customer had only left $50,000 to be picked up.

194.    On June 23, 2024, at approximately 10:46 p.m., TAO using **TARGET TELEPHONE 11** called ███████ 4173, used by an unknown female ("UF4173"). During the call, TAO said, "Baby, I am going, going to load the stuff I am just done with onto my car. Then, you will drive the car inside. How does it sound?" UF4173 replied, "Okay." TAO later said, "I have just finished. I am going to load the car now." UF4173 asked, "Shall I go drive the car now or wait for you to call me?" TAO said, "Baby, wait for my call. Let me load the car first."

195.    Based on my knowledge and experience, I believe that when TAO used the term "stuff," he was referring to marijuana, in this case, a large quantity of marijuana he was loading into his car. I further understand that TAO wanted UF4173 to drive that car, loaded with marijuana, into the parking garage ("Drive the car inside") at their residence. Investigators know this residence has an attached garage to the location.

196.    During the course of this investigation, West 10th Street, New York, New York ("the WEST 10th ST. PREMISES") was identified a location in which XU's confederates, namely ZHONG, were often observed bringing suspected bulk U.S. currency drug proceeds into or out of.

197.    For example, on April 7, 2024, at approximately 7:24 p.m., ZHONG using **TARGET TELEPHONE 7** called **TARGET TELEPHONE 6**, used by XU. During the call, ZHONG asked XU what to do with "the money." XU directed ZHONG to "put it at home." Based on the evidence gathered during the investigation to date, I believe ZHONG had picked up drug trafficking proceeds from a XU MLO/DTO customer.

198.    On June 7, 2024, at approximately 11:29 p.m., XU called ZHONG.  During the call, XU directed ZHONG to bring a "box of paper" over to "West 10th Street."

199.    At approximately 11:58 p.m., ZHONG arrived at West 10th Steet in New York, New York, in his white Mercedes Benz bearing New York registration KUJ-9652.  ZHONG removed a box from the trunk and walked to West 10th Street. Seconds later, ZHONG left, no longer holding the box. ZHONG can be seen getting into the passenger side of the vehicle as he departs in the below photograph:



200.    Based on the above-described call and surveillance, I believe ZHONG, at XU's direction, transported drug trafficking proceeds ("paper") in the box ZHONG removed from his trunk.

201.    On June 18, 2024, at approximately 11:35 p.m., XU using **TARGET TELEPHONE 6** called **TARGET TELEPHONE 7**, used by ZHONG.  During the call, XU directed ZHONG to take money to "West 10th Street."

202.    At approximately 11:38 p.m., ZHONG called (415) 889-9921, used by HUYNH. During the call, ZHONG said he would be there in "twenty minutes to hand off some paper." HUYNH acknowledged.

203.    Moments later, at approximately 11:42 p.m., ZHONG exited his residence carrying a large bag, which appeared to be weighed down.

204.    At approximately 12:02 a.m., ZHONG arrived at West 10th Street. Upon arriving, ZHONG called HUYNH. During the call, ZHONG asked, "Is it brother Hue?" HUYNH replied, "Yes." ZHONG said, "Hey, Brother Hue. I'm there already." HUYNH replied, "Okay, alright. I am coming downstairs now." ZHONG removed a large bag from the rear seat of the vehicle he was driving, as depicted in the red circle within the image below.



The bag appeared to be the same one ZHONG had carried out of his residence. At the same time, HUYNH exited West 10th Street and both men then walked to West 10th Street together, and moments later, ZHONG left without the bag.

205.    At approximately 12:25 a.m. the same day, XU using **TARGET TELEPHONE 6** called (503) 899-2425, used by QIN, a known source of supply for the XU MLO/DTO.  During the call, XU said, "Boss Qin.  Ten units has been delivered."  QIN replied, "Delivered ten units to him already?  Okay."

206.    On June 28, 2024, investigators were conducting physical surveillance at the WEST 10th ST. PREMISES.

207.    Investigators observed HUYNH exit with a black book bag and enter a vehicle as a passenger.  Investigators followed HUYNH as he arrived at a FedEx Store located at 526 86th Street, Brooklyn, New York.  HUYNH entered the store and proceeded to ship two packages, as contained in the red circle depicted in the image below.



208.    While in the store, agents overheard HUYNH inquiring as to why his previous packages had not been shipped out of New York yet.

209.    Investigators learned from an administrative subpoena that four packages addressed to "Kwai Ling Kwok" at an address for a FedEx Store located at 9919 SE Sunnyside Road,

Clackamas, Oregon had recently been shipped by HUYNH, who provided the WEST 10th ST. PREMISES as his return address.

210.    On June 30, 2024, at approximately 11:36 p.m., XU using **TARGET TELEPHONE 6** called (415) 889-9921, used by HUYNH.  During the call, XU told HUYN he was "at the door."

211.    Agents reviewed surveillance camera footage from this time, which showed XU arriving at the WEST 10th ST. PREMISES in his Honda sedan and stopping curbside.  HUYNH then exited the WEST 10th ST. PREMISES and retrieved a weighed-down bag from the Honda's trunk.  HUYNH then entered the WEST 10th ST. PREMISES carrying the bag.

212.    On July 1, 2024, agents learned via administrative subpoena that HUYNH shipped two new FedEx parcels from the FedEx store located at 526 86th Street, Brooklyn, New York, each weighing 15 pounds.  The packages were once again addressed to "Kwai Ling Kwok" the same FedEx Store address in Oregon.  The packages were shipped by HUYNH, who again provided the WEST 10th ST. PREMISES as his return address.

213.    The six above-described packages shipped on June 27, June 28, and July 1, 2024, were subsequently held by law enforcement pending a search and seizure warrant, on the belief that the packages were likely to contain drug trafficking proceeds.

214.    On July 1, 2024, at approximately 10:11 p.m., agents intercepted a call between **TARGET TELEPHONE 6** and **TARGET TELEPHONE 11**, used by TAO.  During the call, XU said, "Motherfucker!  The Seattle paper route I sent money with got busted today.  Holy Shit! Possibly because of July 4th.  Therefore, do not ship anything out."  XU later said, "He has been operating without any issues for so many years. Today got busted."  TAO asked, "Wow… Was it a lot, the loss?"  XU replied, "Seventy units."

215.     Due to my knowledge and experience with this investigation, I know XU often uses the terms "chicken" and "unit" to refer to $10,000 in drug trafficking proceeds. Based on the above-described events, I believe XU was telling TAO that the packages shipped by HUYNH had been seized by law enforcement. I further understand that these shipments were sent along a larger "Seattle paper route," which I believe indicates that the packages were to be transported again after arriving in Oregon. I also believe XU told TAO that the packages contained approximately $700,000 in drug trafficking proceeds ("Seventy units.").

216.     On July 2 and July 3, 2024, the Honorable Jeffrey Armistead, U.S. Magistrate Judge for the District of Oregon, signed search and seizure warrants for the six above-described parcels (Case Nos. 24-mc-00695). Agents executed the warrants and seized over $650,000 in U.S. currency from the parcels. Agents observed the money was very well organized, sorted by denominations, vacuum sealed and precisely laid out (see pictures below). Based on investigators' training, knowledge, and experience, investigators know this is consistent with how drug traffickers package their proceeds. The amount seized is consistent with XU's description of having lost approximately $700,000:



217.     On July 3, 2024, at approximately 6:44 p.m., XU using **TARGET TELEPHONE 6** called ▮▮▮▮-2425, used by QIN. During that call, XU asked, "What's going on?" QIN replied, "You need to comfort Brother B. To have a heart to heart conversation over a cup of tea."

XU stated, "He will be fine by having a drink."  Moments later, an unknown third party (UM2) got on QIN's line and spoke to XU.  UM2 said, "Can, what is up?"  XU replied, "What's up? Is everything okay?"  UM2 stated, "I am telling you.  I am okay.  I am afraid of that you guys misunderstand, so I notified President Qin right away on that day, to let him know the person is fine."  XU asked, "Hey, have you received the document on the following day?"  UM2 informed, "Not able to receive it, because Brother Hua/Hue's name is on the blacklist. I failed on that day was because I was in rush. I shouldn't have mailed the last two bags."  XU replied, "Uh."  UM2 continued, "Those are 280,000.  Motherfucker."  XU and UM2 continued discussing the issue with UM2's shipment, noting that security appeared to be heightened due to Independence Day.  Later in the call, XU said, "I think you had better to use, not to use FedEx company, you find a way to dispatch by using pallet, it will be the safest way, but…" UM2 asked, "To transport by a pallet" XU replied "Yes, the pallet is like a…"  UM2 interrupted, "Like those private jet."  XU stated, "To transport by pallet, like those one board after another board, to transfer via airplane, then to be carried by in a truck and ship it over directly, but it will be longer period of time.  However, you will be safe.  I mean, just like us, for transporting the cigarettes out of country, we have used the office screen/room divider.  We have stacked one cigarette after another into inside of the screen/room divider.  The cost is higher, I have been doing for a long period of time, and I have never had any problem." After further discussion of future shipments, XU said, "It is kind of… doing paper… I previously have three routes for Seattle, and all of the three routes were fucking busted."

218.    Based on my knowledge and experience, as well as the prior calls and package seizure, I believe "Brother B" is a close associate of—and source of marijuana supply for—XU and QIN.  I believe the drug trafficking proceeds seized from the FedEx packages were destined

for QIN and "Brother B," and that QIN wanted XU to reassure "Brother B" regarding the seizure of the packages. I believe that UM2 was, in fact, "Brother B," and that during the call, he believed that HUYNH ("Brother Hua") had been "blacklisted" by FedEx because his name was on the packages that were seized. I know from my training and experience, that the callers were using the term "paper" to refer to drug trafficking proceeds during this call. I therefore understand that XU went on to direct "Brother B" to conceal the drug proceeds among shipments on pallets that would be transported by air or ground. Additionally, I believe XU told "Brother B" that three routes XU had been using to transport drug trafficking proceeds through the Seattle area had been "busted" by law enforcement.

219.    On August 1, 2024, at approximately 8:53 a.m., investigators intercepted communications between MICKLOS, utilizing **TARGET TELEPHONE 9**, and ▮▮▮▮, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ During the call, MICKLOS told ▮▮▮, "He said, uh, he called his people and putting everything together now." MICKLOS later said, "Yeah. But, I'll, I'll call him periodically like, I'll call him in like, forty (40) minutes. I already called him ten (10) minutes ago. So, I'll call him in like, you know, like forty (40) minutes, forty-five (45) minutes, and just ask for an update, and he'll tell me." MICKLOS also told MACK, "It's only... it's only two hundred and like, fifty."

220.    GPS location data from ▮▮▮▮▮▮▮ (**THE TARGET VEHICLE**) and phone[8] showed that ▮▮▮ had driven from Baltimore to New York the night prior. Based on that information and what was said during the call, investigators believed MICKLOS was organizing

---

8 On June 11, 2024, the Honorable Copperthite, U.S. Magistrate Judge for the District of Maryland, authorized the installation of a GPS tracking device on ▮▮▮▮▮▮▮ (Case No. 24-mj-1460-ADC). On June 26, 2024, the Honorable Austin, U.S. Magistrate Judge for the District of Maryland, authorized the collection of location data from ▮▮▮ phone (Case No. 24-mj-01554).

a meeting between ███, XU, and ZHONG to pick up 250 pounds of marijuana on behalf of the MICKLOS DTO.

221.    At approximately 9:45 a.m., agents established surveillance on ███, who was parked in the vicinity of CubeSmart Self Storage located at 266 Wild Avenue, Staten Island, New York.  MACK was driving **THE TARGET VEHICLE**.  Agents maintained surveillance of ███ as he drove to a local food establishment.

222.    At approximately 11:25 a.m., agents established surveillance in the vicinity of the **KATAN PREMISES** and observed two cars parked at the location: ZHONG's black 2023 Chevrolet Suburban bearing NY registration T706557C (the **SUBURBAN**) was parked backed in the driveway, and LIU's grey 2023 BMW M235i bearing NY registration KI19 (the **LIU BMW**) was parked directly in front of the residence.

223.    At approximately 11:45 a.m., ███, using ███-3862 called **TARGET TELEPHONE 6**, used by XU.  During the call, ███ asked, "Hey, what's going on?  Um... everything looking good?"  XU replied, "Yeah, uh... uh, where are you right now?"  ███ said, "Um... I'm at a diner. I don't know exactly where, but not too far, about ten minutes away from the hotel."  XU replied, "Uh, I think we... we... we can do at the... uh... at the hotel parking lot, so just wait there.  I'm... I'm... I'm telling my guy to drive over there... as soon as possible."  ███ acknowledged, and XU said, "Let... let... let me call him, and give you the ETA, right now."

224.    At approximately 11:48 a.m., investigators observed ███ return to Fairfield Inn and Suites located at 290 Wild Avenue, Staten Island, New York in **TARGET VEHICLE**.

225.    At approximately 12:29 p.m., XU called ███.  During the call, XU informed, "Yo, they... they are there but, uh, it's on the next door.  The storage unit parking lot.  It's a

Suburban. Black color." ▮▮▮▮ asked, "Storage unit parking lot?" XU confirmed, and ▮▮▮▮ asked, "Okay. And, [voices overlap], what color then?" XU said, "Just... Uh, Suburban."

226.    At approximately 12:32 p.m., agents observed **THE TARGET VEHICLE** move from the hotel parking lot to the CubeSmart parking lot. Investigators could see that both ▮▮▮▮ and ▮▮▮▮, another associate of the MICKLOS DTO, were in the vehicle.

227.    At approximately 12:41 p.m., ZHONG's Suburban entered the CubeSmart parking lot and parked some distance away from **THE TARGET VEHICLE**. When ZHONG arrived, **THE TARGET VEHICLE** moved from its parking spot and parked directly next to ZHONG's Suburban. While the cars were parked next to each other, agents observed both rear trunk doors open, and bags being transferred from the Suburban to **THE TARGET VEHICLE**. Based on the above-described calls and surveillance—and numerous other instances during which similar transfers were observed taking place—investigators believed the bags contained marijuana.

228.    At approximately 12:47 p.m., investigators observed ▮▮▮▮ and ▮▮▮▮ exit the CubeSmart parking lot in the **THE TARGET VEHICLE**. ZHONG also exited the parking lot in the Suburban at that time. Investigators saw an individual in the front passenger seat of the Suburban, who was later identified as LIU.

229.    At approximately 1:01 p.m., the Suburban returned to 715 Katan Avenue, Staten Island, New York, 10312 (the **"KATAN PREMISES"**), a location recently identified as LIU's residence. Upon parking, investigators saw ZHONG and LIU enter the KATAN PREMISES. Investigators saw that ZHONG was carrying a weighted bag that, based on the above-described calls and surveillance, investigators believe contained drug trafficking proceeds.

230.    At approximately 1:24 p.m., LIU exited the KATAN PREMISES with a black squared-off plastic bag containing the suspected drug proceeds (contained in the red circle depicted

in the image below) and walked toward LIU's BMW make vehicle. LIU placed the bag into the BMW's trunk, got in the driver's seat, and left the area in his car.



231. Based on the above-described calls and surveillance, I believe ZHONG and LIU took 250 pounds of suspected marijuana from the KATAN PREMISES and delivered it to █████ on behalf of the XU MLO/DTO. I further believe that during the exchange, █████ delivered drug trafficking proceeds to ZHONG and LIU on behalf of the MICKLOS DTO. I believe those proceeds were in the black bag LIU carried out of the KATAN PREMISES.

232. On August 5, 2024, at approximately 6:05 p.m., XU using **TARGET TELEPHONE 6** called **TARGET TELEPHONE 7,** ZHONG. During the call, ZHONG told XU he would be at "715" in ten minutes. ZHONG told XU he would "pack nine bags of stuff."

233. Based on my knowledge and experience, I understand this call to mean that ZHONG was going to the KATAN PREMISES ("715") to pack nine back of marijuana. I know

from evidence gathered during this investigation that the XU MLO/DTO often refers to marijuana as "stuff."

## IV.  BIOMETRIC UNLOCKING

234.    In my training and experience, and participation in this investigation, it is likely that electronic devices with biometric unlocking features, such as fingerprint unlocking or facial recognition, will be found within the **TARGET PREMISES** or the **TARGET VEHICLE**, or on the **TARGET SUBJECTS**.  Based upon my training and experience, I know that these devices support biometric unlocking features.

235.    I know from my training and experience, as well as from information found in publicly available materials, that some models of devices, such as some Apple iPhones and iPads, and the Samsung Galaxy, offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of an alphanumeric password or pattern password.  In addition, newer versions of the Apple iPhone and related Apple products contain a "Face ID" feature that allows the phone to be unlocked by scanning a user's face.  Some encrypted messaging applications also offer their users the ability to unlock the application using a fingerprint, and the WhatsApp end-to-end encrypted messaging application allows users to lock their messages using biometric authentication tools.

236.    If a user enables fingerprint unlocking, he or she can register a fingerprint, and frequently more than one, that can be used to unlock that device or application. The user can then use any of the registered fingerprints to unlock the device/application by pressing the relevant finger(s) to the device's fingerprint sensor, which may, for example, be integrated into the home button, integrated into the screen, or installed on the back of the device. In my training and experience, smartphone users commonly enable fingerprint unlocking when it is available because

it is considered to be a more convenient way to unlock the device/application than by entering an alphanumeric or pattern password.

237.    In some circumstances, a fingerprint cannot be used to unlock a device even if fingerprint unlocking is available and enabled, and a passcode or password must be used instead. These circumstances might, or might not, include: (1) when more than 48 hours has passed since the last time the device was unlocked, (2) when the device has not been unlocked for 8 hours and the passcode or password has not been entered in the last 6 days, (3) when the device has just been restarted or powered on, (4) when attempts to unlock via fingerprint have failed a specified number of times, and (5) when the device has received a remote lock command. Thus, in the event law enforcement encounters a locked device, the opportunity to unlock the device via fingerprint may exist only for a short time.

238.    The passcode or password that would unlock a given device recovered during execution of the requested warrant likely will not be known to law enforcement. Thus, in attempting to unlock any such devices for the purpose of executing the searches authorized by the requested warrants, it will likely be necessary to inform the **TARGET SUBJECTS** that the warrant requires them to press a finger or thumb to the Touch/ID reader of the devices capable of biometric unlocking, or to hold the device(s) to their faces to activate any facial recognition biometric unlocking.  This is similarly true for any applications that the user has chosen to secure with a biometric lock.  The government may not otherwise be able to access the data contained on those devices, or in those applications, for the purpose of executing the search authorized by this warrant.

239.    Due to the foregoing, because I have probable cause to believe that, as specified above, that any cellphone used by the **TARGET SUBJECTS** has biometric features engaged, I

seek permission for law enforcement personnel to: (1) inform **TARGET SUBJECTS** that they are required to place a finger or thumb to the fingerprint scanner of the specified electronic devices; and/or (2) hold the specified electronic devices in front of the faces of **TARGET SUBJECTS** for the purpose of attempting to unlock the specified devices in order to search the contents as authorized by this warrant.

240.    The government will use all reasonable efforts to protect the privacy interests of third parties, including the **TARGET SUBJECTS** family members/co-occupants, in conducting the search authorized by this warrant.  The government agents understand that this search relates to devices and other evidence used by **TARGET SUBJECTS** to further the criminal scheme.  To identify devices that are used by the **TARGET SUBJECTS**, law enforcement will attempt to ask **TARGET SUBJECTS** to identify which device(s) are theirs or used by them (and which belong to others), and/or to ask other residents of the house which devices are owned or used by **TARGET SUBJECTS**.

## V.    CONCLUSION

241.    Based on the foregoing, I submit that there is probable cause to believe that within the **SUBJECT PREMISES, TARGET VEHICLE** and on the persons of the **TARGET SUBJECTS** are fruits, evidence and instrumentalities of the above-described **SUBJECT OFFENSES**.

242.    Based on the foregoing, I further submit that there is probable cause to determine that the **ARREST SUBJECTS** have committed the **SUBJECT OFFENSES**.

243.    WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue search warrants for the **SUBJECT PREMISES**, **TARGET VEHICLE**, and **TARGET SUBJECTS**, authorize the search and the seizure of the items described in Attachment

B, which constitute fruits, evidence and instrumentalities of violations of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. § 1956, and authorize complaints and arrest warrants for the **ARREST SUBJECTS**.

244.    I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Respectfully Submitted,

Ryan Welsh, Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this _____23rd_____ day of September, 2024.

Honorable A. David Copperthite
United States Magistrate Judge
District of Maryland











































**ATTACHMENT B**
**Items to be Seized**

The items to be seized are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. 1956(h) (Conspiracy to Commit Money Laundering) and 21 U.S.C. 846 (Conspiracy to Distribute Controlled Substances), for the period from January 1, 2023 to the present, including the following:

1.    Controlled substances;

2.    Paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution, to include, scales, plastic bags, gelatin capsules, vials, cutting agents (such as Mannitol and Quinine), and kilogram wrappers;

3.    Currency or currency equivalents;

4.    Records of narcotics or money laundering transactions including, but not limited to, books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

5.    Financial records and other records or documents reflecting money laundering, narcotics trafficking activity, or the disposition of narcotics proceeds, including, but not limited to, currency; financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit cards; credit card records; pre-paid credit cards; green dot cards and documents relating thereto; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

6.    Records that identify other co-conspirators and gang members, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones/cellphones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored inside those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

7.       Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

8.       Identification documents;

9.       Records of travel including, but not limited to, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

10.      Indicia of occupancy, residency, rental, control, and/or ownership of the premises, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

11.      Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof; and

12.      Cellular telephones, tablets, pagers, or other portable electronic communications devices, and any memory cards for portable communications devices and any related records.