LNE 10.2.25



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

| | | | |
|---|---|---|---|
| *Alexander Levin* | *Mailing Address:* | *Office Location:* | *DIRECT: 410-209-4948* |
| *Assistant United States Attorney* | *36 S. Charles Street, 4th Floor* | *36 S. Charles Street, 4th Floor* | *MAIN: 410-209-4800* |
| *Alexander.Levin@usdoj.gov* | *Baltimore, MD 21201* | *Baltimore, MD 21201* | *FAX: 410-962-0717* |

USDC - BALTIMORE
'25 NOV 18 AM 10:46

October 28, 2025

<u>**Via Email Only**</u>
C. Justin Brown, Esq.
Brown Law
233 E. Redwood Street, Suite 1000C
Baltimore, MD 21202

        Re:    <u>United States v. Praveen Morgan,</u>
               Criminal No. BAH-24-289

Dear Counsel:

        This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Praveen Morgan (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **November 11, 2025**, it will be deemed withdrawn. The terms of the Agreement are as follows:

Offense of Conviction

*Superseding* ^AC̶S̶B̶ PM

        1.     The Defendant agrees to plead guilty to Count Two of the Indictment, which charges the Defendant with Conspiracy to Distribute Marihuana, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

Elements of the Offense

        2.     The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

APL
(JB
PM

        In or around the times alleged in the Superseding Indictment, in the District of Maryland, ~~the Defendant~~:

        a.   An agreement existed between two or more persons to violate the federal drug laws to distribute, or possess with the intent to distribute, a mixture or substance containing a detectable amount of marihuana; and

        b.   the Defendant knowingly and voluntarily joined in that agreement.

## Penalties

3.      The maximum penalties provided by statute for the offense(s) to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|-------|---------|----------------|----------------|--------------------|--------------|--------------------|
| 2 | 21 U.S.C. §§ 846 and 841(b)(1)(C) | N/A | 20 years | Life maximum; 3-year minimum | $1,000,000 | $100 |

a.      Prison:  If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.      Supervised Release:  If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c.      Restitution:  The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d.      Payment:  If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d).  The Defendant may be required to pay interest if the fine is not paid when due.

e.      Forfeiture:  The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.      Collection of Debts:  If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt.  If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law.  Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control.  Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns.  The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

2

## Waiver of Rights

4.    The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.    If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.    If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.    If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.    The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.    If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.    By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.    If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further

trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

   h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

<u>Public Benefits in Drug Cases</u>

   5. The Defendant understands and acknowledges that under 21 U.S.C. §§ 862 and 862a, a person who has been convicted of a federal offense involving the distribution or possession of controlled substances may be denied certain federal and state benefits such as loans, grants, or food stamps.

<u>Advisory Sentencing Guidelines Apply</u>

   6. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

   7. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

   a. This Office and the Defendant further agree that the applicable **base offense level is 30**, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(a)(5) and (c)(5), because the amount of marihuana attributable to the conspiracy was more than 1,000 kilograms but less than 3,000 kilograms.

   b. This Office will argue at the time of sentencing that the Court should further apply an **increase of 3 levels**, pursuant to U.S.S.G. § 3B1.1(b), because the Defendant was a manager of supervisor of criminal activity involving five or more participants. The Defendant opposes this enhancement and reserves the right to argue against it at any sentencing hearing.

      c.     This Office does not oppose a **2-level reduction** in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an **additional 1-level decrease** in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

      The final adjusted offense level for Count Two is therefore **30.**

      8.     There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

      9.     Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range. This does not, however, preclude either party from raising adjustments that may apply as a consequence of the Court's ruling on the above-described role adjustment under U.S.S.G. § 3B1.1(b), such as any adjustments under U.S.S.G. §§ 4C1.1 or 2D1.1(b)(18) and 5C1.2.

## Obligations of the Parties

      10.     At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

      11.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

        a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

        b.      The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

            i.      The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

           ii.      This Office reserves the right to appeal any sentence below a statutory minimum.

        c.      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

Forfeiture

        12.      The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

        13.      The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to any forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

        14.      The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

6

### Defendant's Conduct Prior to Sentencing and Breach

15.     Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

16.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

17.     The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

18.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Kelly O. Hayes
United States Attorney

Alexander Levin
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_11/3/25_
Date

Praveen Morgan
Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

_11/3/25_
Date

C. Justin Brown, Esq.
Counsel for Defendant

8

USDC- BALTIMORE
'25 NOV 18 AM10:46

# ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

An investigation that began in early 2023, led by the Drug Enforcement Administration (DEA), Baltimore Division, and Homeland Security Investigations (HSI), Baltimore Division, into two separate non-fatal shootings of Michael Micklos Jr. in Baltimore, Maryland revealed a sprawling network of individuals laundering millions of dollars generated from the illegal distribution of massive quantities of marihuana. In general, Michael Micklos and Malik Bridgers orchestrated the sale of bulk quantities of marihuana in Maryland, as well as in other states (including Virginia and New York). Micklos, Bridgers, and their co-conspirators would then transport the proceeds of those sales to a larger network of money launderers, primarily operating in the New York and New Jersey area and reporting to co-conspirator Can Xu. Xu and his network would, in turn, commingle the proceeds from Micklos' and Bridgers' organizations with other drug trafficking proceeds before transporting (via various means) the bulk U.S. currency to other money launderers and drug traffickers in Oregon, Washington, and elsewhere. All of the movement of proceeds was undertaken with the purpose of (1) using the proceeds as payment for further shipments of marihuana that would then be sold and (2) concealing the true nature and source of the proceeds.

Over the course of the investigation, agents recovered from co-defendants and other members of the conspiracy: over $6 million in U.S. currency, over 2,300 pounds of marihuana, as well as firearms and ammunition.

Praveen Morgan, the Defendant, was responsible for several aspects of Micklos's drug trafficking scheme, including but not limited to: maintaining the Telegram account used by Micklos to advertise marihuana for sale; keeping and using "shop phones" to receive orders from potential customers in Maryland and elsewhere; and tracking sales inventory and revenue.

Agents intercepted dozens of communications between the Defendant and his associates that related to the procurement and distribution of marihuana and the movement of proceeds from that distribution, as well as numerous other communications between other members of the conspiracy discussing the Defendant's role. Agents corroborated what was intercepted in these communications through surveillance and the collection of other evidence:

### January 24, 2024 Money Dropoff

On January 24, 2024, investigators observed co-conspirator Michael Tilmon—who was primarily responsible for overseeing marihuana distribution in the Baltimore area on behalf of Micklos—load a heavy gray tote into his truck at a storage facility known to be used by Micklos and his co-conspirators to facilitate their drug distribution activities. Tilmon then drove away, and phone records show that he called another unindicted co-conspirator ("CC") roughly an hour after

9

leaving. Investigators know from additional surveillance and intercepted calls that CC often acted as a courier for Micklos and transported drug trafficking proceeds and marihuana between New York and Baltimore on Micklos's behalf.

Surveillance footage from the "Urby" apartments located at 7 Navy Pier Court, Staten Island, New York—Micklos's residence at the time—showed Micklos drive into the parking garage, followed by the Defendant, driving his own vehicle. At approximately 4:40 p.m., surveillance footage showed the Defendant and Micklos exiting an elevator and walking toward Micklos's apartment, with Micklos carrying the gray tote Tilmon was seen loading in his truck.

Roughly 20 minutes later, at approximately 5:00 p.m., Micklos posted a video to his Instagram account ("1buckets") showing him opening the gray tote to reveal that it was full of U.S. currency: the proceeds of drug trafficking activity. And at approximately 9:23 p.m., building surveillance showed the Defendant leaving the building, now carrying a black bag that agents believe contained drug trafficking proceeds.

<u>March 2024 Sales</u>

The Defendant was responsible for keeping and using multiple "shop phones," which were phones—usually subscribed to a third party with no connections to the drug trafficking enterprise—used to communicate with customers placing orders for marihuana. Contact information for shop phones was provided to customers via Micklos's Telegram account, which he used to advertise what marihuana was available for sale and its price.

In general, the Defendant would receive a text from a customer placing a drug order. The Defendant would then communicate the order to the co-conspirator Tilmon handling sales in the Baltimore area. The Defendant would usually provide customers with Tilmon's contact information to finalize the sale. The Defendant would continue communicating with Tilmon to verify that payment had been received and sales completed. In early March 2024, agents intercepted communications showing numerous examples of this pattern of activity.

The Defendant also kept detailed ledgers of inventory and sales. On March 18, 2024, Micklos posted a video to his Instagram account showing the Defendant with one of these ledgers on his lap, appearing to show numerous sales. During the recording, Micklos can be heard yelling, "All sold out flavors! Everything's sold out!" Based on this recording, investigators believe that the Defendant along with his co-conspirators were engaging in drug trafficking activities and that they had sold out of their marihuana inventory.

<u>March 28, 2024 Money Pickup</u>

On March 28, 2024, Tilmon transferred drug trafficking proceeds to the Defendant in Aberdeen, Maryland. Recorded calls from Tilmon's phone showed that he was preparing to meet someone at approximately 7:00 p.m. that day, and that he had to count money before that meeting. Specifically, Tilmon noted that "Veen" (a nickname for the Defendant) would be handling the pickup and on a call at approximately 5:09 p.m. told a co-conspirator, "I gotta leave here meet Veen by seven o'clock."

On March 28, 2024, investigators saw Tilmon park his blue Jeep Wrangler in front of his apartment in Aberdeen, Maryland and carry a grey Rubbermaid tote into the residence. After some time, Tilmon left the residence carrying the same tote, which was now believed to be filled with drug trafficking proceeds. Tilmon and the Defendant met in a parking lot in Aberdeen, where Tilmon transferred the tote to the trunk of the Defendant's BMW. Both Tilmon and the Defendant then left the parking lot and drove in separate directions; the Defendant drove the tote containing the proceeds back to the New York area.

<u>August 29, 2024 Marihuana Resupply</u>

On August 29, 2024, at approximately 9:21 a.m., Micklos called the Defendant and notified him that a delivery of marihuana was coming to Baltimore that day. Micklos asked the Defendant to let co-defendant Steven Mack know that the delivery was arriving. The Defendant asked if the delivery was coming from "Shawn" (referring to co-defendant Can Xu), and Micklos confirmed that it was.

Investigators had already identified 2027 N. Pulaski Street, Baltimore, Maryland as a stash house used by Mack to store marihuana on behalf of Micklos. On August 29, 2024, at approximately 12:45 p.m., investigators surveilling the stash house saw Mack arrive and, roughly 20 minutes later, meet up with two unknown males and enter the building. One of the unknown males was carrying a large white bag containing marihuana, which he brought inside. The men left the building, again carrying the white bag, which was now empty.

Surveillance of the stash house then showed Mack return, driving a U-Haul truck, with the same two unidentified males riding as passengers. Mack parked the truck near the stash house, and all three men unloaded 18 large cardboard boxes from the back of the U-Haul. 11 boxes were transferred to Mack's vehicle, and 7 were transferred into the stash house. Roughly an hour later, an unindicted co-conspirator was seen transporting numerous large brown cardboard boxes to another stash location used by Micklos and his co-conspirators, located at 555 S. President Street, Baltimore, Maryland. At approximately 2:44 p.m., Micklos called Mack, and the two discussed the delivery.

Agents believe that all the boxes observed during these transactions contained marihuana Micklos had procured from Xu and that Micklos arranged to have transported to Baltimore for distribution.

<u>September 24, 2024 Search of the Defendant's Residence</u>

On September 24, 2024, agents searched the Defendant's residence in Union, New Jersey. In the residence, agents found multiple phones—including the shop phones—and ledgers consistent with the Defendant's role in Micklos's drug trafficking organization.

The Defendant agrees that, beginning on or about December 2023, and continuing through in or about September 2024, he conspired with others to distribute and possess with the intent to distribute marihuana. Based on the amount of marihuana seized by agents over the course of the investigation—including marihuana seized on March 7, 2024 in Washington, D.C., March 22, 2024 in New York, March 27, 2024 in Maryland, September 9, 2024 in Maryland, September 24,

2024 in Maryland, New York, and Washington, and September 26, 2024 in Maryland and Virginia—the total amount of marihuana involved in the drug distribution conspiracy was at least 2,300 pounds (approximately 1,043 kilograms). The Defendant further agrees that approximately 1,043 kilograms of possessed and/or distributed marihuana was attributable to the Defendant based on his own conduct and the conduct of other conspirators reasonably foreseeable to him. And the Defendant agrees that, based on the amount of U.S. currency seized by agents over the course of the investigation, the total amount of drug trafficking proceeds generated by the Defendant and his co-conspirators over the course of the conspiracy was at least $6,085,073.

SO STIPULATED:

_____
Alexander Levin
Assistant United States Attorney

_____
Praveen Morgan
Defendant

_____
C. Justin Brown, Esq.
Counsel for Defendant